Case number 22-3274, USA v. Stephanie Rentas. Arguments not to exceed 15 minutes per side. Mr. Kozak, you may proceed for the appellant. Thank you. Chris Kozak for Appellant Stephanie Rentas. Binding circuit precedent should compel the court to vacate the sentence in this case. The District Court's factual findings are inconsistent with undisputed facts in the record. It did not give an explanation for several crucial arguments and facts that were presented to it. To make matters worse, it also extended an enhancement well beyond the text and farther than any court, so far as I'm aware, has applied it. On the drug quantity issue, one thing that didn't quite come through as clearly as maybe it should have in the briefs is the issue of Section 8. When she said to the District Court, I paid this rent on this vacant unit because they were giving out Section 8, what she's referring to is there's a certain subpart of the HUD regulations that says if the housing agency goes into a partnership with the private developer to turn something into Section 8 housing, the people who live there who are currently paying the rent, they automatically win the Section 8 lottery. And the Section 8 lottery can be 3-to-1, 10-to-1, 600-to-1 odds, and then you sit on a waiting list for forever. But under those regulations, you automatically win the lottery and you get moved to the front of the line. So when we say she had a legit... What is the effect of winning the lottery, so to speak? You just have a very reduced rent? So it's a little bit like school vouchers in the sense, except that it's not just substitute for taxes. The government pays a portion of your rent to a private landlord. And so you get to live in what's essentially market-rate rent apartments. Your standard of living goes way up from, say, a public housing unit. But you only pay a portion of the rent. So it's a huge increase in the standard of living for someone who's poor. And thousands of people apply for Section 8 vouchers. Very few get them. So my point is, at least, that it makes perfect sense that she would do this. There's a reasonable, more than reasonable inference, I would say. Sure, but even if that's true, it doesn't have to be her maintaining of the apartment, even if she's maintaining it for multiple purposes. She could have been living there and using it as a drug house. And we'd say, well, you have multiple purposes for this house. One is to provide yourself with shelter. And the other is to facilitate your drug transaction. So even if she has a benign purpose for paying the rent, if she has an illicit purpose as well, it doesn't matter. So that's certainly true. There's no evidence that she lived there. The government actually argues that the unit was vacant, that nobody lived there. And there's no evidence that she had been there for two years at least. But this isn't really so much about the primary purpose element as it is about whether she was connected to those packages at all. Under the deferential standard of review for drug quantity, though, don't we – so you're raising a plausible inference that could have been used to convince the district court. But don't you think it's an equally plausible inference that people don't generally pay rent at a location at which they're not living and that maybe she was doing this not because of the Section 8 concern but because she was using it as a drug house? So I think the standard of review is very difficult for you to overcome. Just because you make one plausible inference doesn't mean that the district court's alternative inference was plainly unreasonable. So I agree with you that the standard of review is deferential and that perhaps there are two reasonable interpretations here. But there's two problems with that in my view. One is that the district court didn't offer it. My friend gets up here and he gives the most compelling explanation for why this is logical, why the district court's ruling is logical. The district court, in many cases, didn't really offer that reasoning itself. And it's the district court that has to do the sentencing. And the second point is there are other problems with the inference that you're drawing there. And the principal one is the price list. There's a price list that was seized from the house that's undisputed that says this particular enterprise was selling cocaine for $31,000 per kilogram, which if you take the drug quantity she was attributed with, leaves you to about $217,000. And the government only found evidence of about less than one-tenth of that, combining the cash that they seized and attributed to the drug enterprise. And the cash equivalents like the money transfer receipts and stuff like that. And that much money doesn't just vanish. I mean, you either find it in bank account deposits, you find it in cars or possessions that are well above a person's obvious standard of living. You find it in other ways. And the district court never really grappled with, well, how could she have distributed seven kilograms of drugs and this money is nowhere to be found. So that's the big problem. Do you think the drug, I would have thought the drug list or her records cut the other way. Because, I mean, your point and her point at the sentencing was that I was just caught up in this, I was forced to do this for these two packages. But if you're forced to do it for two packages, why would you have this kind of accounting of what seemingly are many transactions? Doesn't that give an inference? Doesn't the accounting materials give an inference that she was a repeat player? So it's an inference of things that aren't disputed. So I understand she did say, you know, I was sort of pressured into this. But she pled guilty, so she gave up any sort of a duress defense. But it's just evidence that she was part of a drug conspiracy, which we admit. I mean, she pled guilty to it. She was responsible for multiple packages. But it doesn't follow just from the fact of having a ledger in your house that you were responsible for this very large, very specific quantity of drugs. I mean, the issue here is the drug quantity. It's not that we're not on sufficiency review for, you know, did I conspire or did I knowingly participate in this conspiracy? We're talking about whether the district court's specific finding of 7 kilograms is clearly erroneous. And it is because, one, there's no explanation for it, and, two, there's other facts in there that I think, in my view, are flatly inconsistent with the finding of 7 kilograms. But I want to move on here for a second to the enhancement. And back to the drug house enhancement. Because there's no evidence at all that she lived there or that anyone lived there. The government, pages 3 and 4 of their brief argues it was vacant. And all, at best, the evidence we have here is that the packages were delivered and left in some sort of a common area or like one of those mailboxes that's down the street that people pick up at large apartment complexes. And that's not a premises. A premises is a very specific thing. It's the commission's interpretation of Congress's use of the word establishment, which I'm not sure why they did that, but that's what they did. But the word premises refers to a very specific thing, and that's the property that a person owns. And unless you actually use the property, the enhancement just can't apply. So your argument is if she uses, if she had drugs mailed in very small quantities so they could be put in her apartment mailbox, you know, everybody has like a little mailbox in the building, in the lobby, and they're in very small quantities so they can fit in a regular size envelope. She gets lots of these packages. That's not a premises? The mailbox is not a premises? And this is the key point. It is a premises, but it's not her premises. It's whoever maintains. It's the landlord. It's whoever owns the property. But doesn't she have control over it? She is the only one who would have the right to receive the packages at that premises, the ones that are addressed to her apartment? So if they stored them in a common room, let's say it's a doorman building, and the doorman takes your package and puts it in the back, and then you show up and you say, you know, I need the packages for apartment 5B, doesn't she have control over that because she's the only one who can claim the packages from apartment 5B that she rents? So perhaps in that situation you'd have a closer question. But the problem is there's not really any proof of what exactly happened here. They didn't go to the apartment. They didn't search it. They didn't gather any evidence about it at all. They picked up the phone. They called the housing authority and said, who rents this place? And they told her, and that was all they did. And this is why we argue for a de novo review. And this is one reason why that's so important, because instead of sort of feeling the district court, feeling its way through that legal question, it will prompt the district court to say, okay, we need some more, I need to find some more facts here. I need to figure out what exactly this, what did she control? What did this place look like? Well, you would concede, setting aside the mailbox, you would concede the apartment. I thought you have always conceded that there was enough facts that the apartment was her premises. Absolutely. And your argument is you need to have a fact finding that the drugs actually made their way into the premises. Right. It has to make, the drugs have to make it into, or the conspirators. How does that, I just don't see a requirement of the drugs actually entering the premises within the text of the guideline. It says, maintained a premises for the purpose of manufacturing or distributing a controlled substance. So if I suppose I had an apartment, or somebody else had an apartment, and they gave the mailbox key to a conspirator who every day would go check the mailbox and get the drugs, the drugs never entered the apartment, but the entire reason the person rented the apartment was to gain access to the mailbox for this drug distribution. I would think it would fall naturally within the text, maintain a premises, so you leased the apartment for the purposes of distributing a controlled substance, even though the controlled substance never actually made it into the premises. You still maintained the premises for the distribution. Why would that textual analysis be wrong? So I think it's because, I think that's a close question, and I think context provides the answer. You can't look at the text in isolation. You have to look at it in the context of what it's doing in the scheme and why it exists in the first place. And I'm not aware of any case that has adopted that view, that the enhancement is that broad. The pretty universal understanding is that Congress mandated this enhancement and the commission promulgated it to be applied to the use of a building, a space, or an enclosure, and that's in the commentary to the guidelines. So even as we argue in our brief, even if it is reasonable to interpret it that way, the commission's interpretation of it is well within the zone of ambiguity, any ambiguity in that word. So you're asking for our deference? Oh, I'm sorry. Judge Gibbons? I was just going to point out that his time was up, but go ahead. I'll make it quick, but you didn't ask for any sort of our deference to the commission's interpretation of this guideline. No, but the commission's commentary certainly informs what the text means. It's not authoritative. It's not binding under the Kaiser case, but it is certainly something the court has to look at. Okay, and can you just real quickly, what is the commission's interpretation that you think is inconsistent with the reading that Judge Murphy just gave you? So the commission defines the premises as a building, a space, or an enclosure. That's the parenthetical in the commentary. Again, I think the ordinary meaning of the text is you have to use the building, but even if Judge Murphy is correct in that that's a reasonable understanding of it, the commission's interpretation sort of dispels that and makes our reading the reasonable one. But I'll reserve the rest of my time. Thank you. All right. All right, Mr. Lewis. Thank you. May it please the court, my name is James Lewis, and I represent the United States. The district court calculated the drug weight here based on some undisputed record evidence about two parcels going to Ms. Rentas, each with a half kilogram of cocaine. It knew, and it was undisputed, that there were two prior parcels going to her workplace, where one of these half kilogram parcels was going, and there were ten prior parcels going to her vacant public housing unit, where one of these half kilogram parcels was going. Based on that, the district court made a common sense conclusion that's supported by some case law we've cited in the Williams case and SegMoney, indicating that there's 14 total parcels. We know two of them contained a half kilogram of cocaine each, so it's reasonable to assume, because these were all similar in size, weight, and they all came from Puerto Rico to two addresses associated with Ms. Rentas, that they all contained a half kilogram of cocaine, and that's how we get to seven kilograms of cocaine. That's clear error review, and there may be different interpretations of how the district court got there, but it's clear error review, and it is supported by the record. I wanted to just, before I forget, just respond to a couple arguments that my friend Mr. Kozak made. First, I want to indicate that Ms. Rentas was actually paying rent. This is in the PSR. If you take a look at her financial assets, it indicates she was paying, I think it was like $650 a month for this residence, this vacant one. The next thing I want to indicate is this was not like an apartment, so before I go into that, I'll say that there's nothing specific in the record actually describing what this Mount Carmel vacant apartment looked like, but it was a row house. It was like a townhouse, and the reason I just want to say that is because our position is that this argument about what a premises means and whether a premises can apply to, you know, an apartment or a common area, that was never raised in the district court by Ms. Rentas' counsel. That's a legal argument about what the meaning of a premises is, and it was never raised. Do you think that the controlled substance has to enter the premises in order for the enhancement to apply? No, Your Honor, we don't. We've cited a couple of cases. First of all, I think there was a case we cited where a garage was used for drug dealing, so I think that might in and of itself rebut it. Don't you think the garage would qualify as the premises if it was attached to the? I'm not sure if it was attached to it or if it was a separate garage in that case, but maybe as another point, there's nothing in the text of the actual guideline to say that the drugs have to go inside the house. What the guideline, I think, says is that you maintain the premises for the purpose of distributing or manufacturing drugs. So if you think about how a drug conspiracy like this works, it's an ongoing conspiracy to mail cocaine from Puerto Rico to Cleveland. Puerto Rico is a source place. Cleveland is an end user place. So having a reliable address, like the Mount Carmel vacant townhouse or apartment, that's something that's pretty important if you're in the business of mailing drugs. We know that there were 11 packages containing cocaine that were mailed there between March and October of 2020. And the fact that there's 11 of these, I think, kind of suggests, and the inference can be drawn, that this was an important thing for the conspiracy, to have this reliable place where you can mail the drugs and they're presumably going to get there and they're going to be on to the next point in the distribution chain. So our answer is we don't think anything in the text requires the drugs to go inside. And that would also kind of create a weird situation where you can imagine somebody meeting someone in the front yard in front of a house where a lot of neighbors live. And then for some unknown reason or unusual reason, the enhancement wouldn't apply to that. And we think that kind of doesn't make a lot of sense when the enhancement is supposed to kind of punish this happening in a residential neighborhood or things like that. So we don't think anything in the enhancement requires drugs inside the house. And again, this argument was not raised in the district court. Do you think there's any limits to the inferences that can be drawn? I'm curious because there is no, I mean, the postal inspector flat out agreed that we have to make an educated guess, I suppose, about what's in the packages because there is no recovery of any of these packages. And do you think at some point that it would be clear error? I mean, if there was 20 packages, if they were different weights and sizes, if they were different addresses in Puerto Rico, you would think at some point it's just an inference that requires more than just a similarity to one package that you did recover. So I appreciate the question. I think what the court is getting at, if I understand it, is at some point maybe is it possible that these packages might have contained clothes or canned food or a PlayStation or something like that. And sure, there's a point where they're so dissimilar where it would be clear error to make that inference. And it's your burden. I mean, you'll agree, I guess it's a lower burden. But do you think that this would be enough to prove beyond a reasonable doubt that the 10 packages contained cocaine? So if you had actually charged the packages? It's a good question. I think probably that if you look at the totality of all that, and this is always a fact-intensive thing, but if you looked at the totality of the facts we have here, which are just to build on a couple things, Ms. Rentas was receiving two parcels of cocaine on the same day, each half kilogram, each coming from Puerto Rico, one to her workplace, one to her vacant house that she's for some reason continuing to pay for. Can I just pause for a minute? And she took responsibility for both of those packages, one to the house, one to the workplace. Correct. You start from that premise. Correct. It's in the factual basis of her plea and her objections to the PSR said, those are both my drug weight, 500 plus 500. So to continue answering the question, that's the starting point. She took one of those packages from her workplace. She drove it to her sister's house on West 41st Street where she was staying. Inside that house was, I think, $23,000, and that was part of the forfeiture proceedings where she admitted, and the district court found that that $23,000 in cash in her house was drug proceeds or facilitation. There are ledgers in the house, I believe one in her bedroom and I think one in her sister's bedroom, that were keeping track of kilograms of cocaine and prices. She had a scale, I believe, in her own bedroom. And then you take a look at that and add in the fact that there's two prior parcels going to her workplace, one of which she's on video putting in the trunk of her car, which is the exact same thing that happened on the date of her arrest. And then there's ten prior parcels going to her vacant apartment. And we just want to point out, they're all either Priority Mail Express or Priority Mail. So these aren't letters or UPS or FedEx. They're all kind of the same type of mailing. They all had, and I'll acknowledge, we don't have specific information about the weights and dates of each of these. It's kind of more generalized, which is how the probation department set this up. But the probation department did indicate, and I don't think there's any dispute about this, that these ten prior parcels all had the same similar size, weight, all came from Puerto Rico. So maybe just in a vacuum, saying if a parcel comes on day one that has cocaine or all the previous parcels contain cocaine, that might not be enough. But when you add in all the other facts, like the cocaine ledgers, $23,000 in drug cash, the fact that the exact same quantity is going to two different locations. How would you respond on the cash point? How would you respond to your friend on the other side's comment that you would have expected to recover a whole bunch more money if there really was cocaine in all these packages? So I think two responses to that. The first one is that's just not how any business works, and that's not how the drug business works. Maybe just kind of think about it for a second. If you're someone in the position of Stephanie Rentas, who it appears, and I was the AUSA who prosecuted this case, that she's receiving drug packages from Puerto Rico, and I think the price for a kilo of cocaine here was, I think it was like $30,000 or $40,000, somewhere in that ballpark. They're coming in from Puerto Rico. At that point, I think it's fair to assume that she's kind of moving them on to the next person in the distribution chain. I don't think there's any evidence in this case to indicate that Ms. Rentas was like selling grams of cocaine to customers who came to her house. She's kind of like, I think the evidence suggests, passing it on to the next person in the distribution chain. So she wouldn't be making $30,000 or $40,000 per package. That's sort of not how this works. She's taking a product, receiving it, and moving it on to the next person in the distribution chain. So you wouldn't earn and profit the full value of each kilo of cocaine by doing that. It kind of makes sense that you would profit maybe a smaller amount. We don't know what that is. But I think that's our response, that she wouldn't earn the full value of the kilo for every time she got one and sent it on to the next point. You would earn sort of a fraction, which is sort of how business works. I just wanted to ask a question about the terms under which she pled guilty. There was no plea deal here. That's correct. This was an open plea to the indictment. I mean, I know counsel on the other side sometimes talks about a purported tentative plea agreement, but that broke down at some point and she pled guilty without. So that's correct. I was the AUSA who had this case. What did you mean? So there was the first sentencing hearing and then the second sentencing hearing. At the first sentencing hearing, I couldn't quite tell. You said you agreed originally with the objection. Can you explain what you meant by that? I either misspoke or there was an error in the transcript. I appreciate that the transcript says the first thing I said was I don't object to the PSR. That's not what I meant to say. I know sort of when the PSR came out, and this is reflected in the record, I think we were all a little bit surprised. I expected the drug weight to be lower. The district court counsel who represented her expected it to be lower. I had a conversation with my office, and we kind of went through the case and thought about it, and we thought that the probation department, it's technically correct. So I know what I meant to say is that we don't object to it. I guess I said I did object to it. I think I just misspoke. But then at that point, I think that she was given the opportunity to withdraw the plea if she wanted to. That's correct. So Judge Nugent, the district judge, after hearing that the calculation was higher than sort of anyone was predicting, gave her an opportunity to withdraw her plea. She decided not to. She asked for a continuance. I think we came back like two or three weeks later and then did the sort of second more full sentencing hearing. Thank you. Unless the court has any additional questions, I don't have anything further. We'll ask the court to affirm. Thank you. Okay. Mr. Kozak. Thank you, Judge Gibbons. I think you just heard the government say that he was the one who prosecuted the case and he expected the drug quantity here to be lower. I think the main problem is there's a whole lot of guesstimating going on in this case. We're guesstimating what the packages are, that they arrived there, that she was in fact coordinating them, that no one else, so some other people who lived in this rundown public housing unit or her ex-boyfriend was actually responsible for these. There's a whole lot of links in this chain of logic, very few of which are articulated by the district court itself, that you need to tie together to get to the result of seven kilograms here. And that's just simply not how sentencing is supposed to work. It's a little bit like algebra. You can't just intuit the answer even if it sure seems like it's right. You have to show your work. And if you do, if you show how all your inferences and logic fit together, you usually get enough credit to pass. But the district court didn't really do any of that here. It just looked at the PSR and it in fact seemed to come into the sentencing hearing, having already made up his mind, and didn't really provide any substantive explanation for why it was rejecting. Most of the time, though, district courts don't write opinions in these guidelines disputes. It's usually just all on the record. I think it's maybe asking a little too much if you think the district court is going to have cogently structured topics, sentences, first, second, third, fourth in the analysis. I think that's why clear error review, we just look at the record and we ask, okay, what was the finding? We know that that was clear. And then we ask, is there sufficient evidence for that finding? I think it would be quite extreme to suggest that a district court must write an opinion in all these cases. So I'm not, to be clear, I'm not contending that. But this Court's precedent is very clear. I think the Barrow case and the Campbell and McReynolds cases say that at least for the central issues, the issues that are objected to, that are raised, that the defendant is making to say this wasn't me or whatever, what have you, the district court has to give a reason. It has to explain why it's rejecting the explanations proffered by the defendant. And that's the Barrow case, which is a binding case. And that's why I'm saying at the very least the court needs to vacate and remand this for an explanation, for why the district court was rejecting these arguments that she was explicitly making to it. And maybe that's not clear error. And a lot of the things that my friend said up here, if you may believe them, I'm not convinced, but if you are, it needs to go back and the district court needs to say, yeah, I agree with that. That's what happened here. And then we review that for clear error and we go from there. But Judge Murphy, I want to pick up on one thing that you said, which is at a certain point there's no limiting principle. And I think this is that case. There's no limiting principle to saying, sorry, my time is up. Do you mind if I finish the sentence? Finish the sentence and then we'll be done. Okay. The size, shape, and timing restrictions, you could extend that to infinity essentially. And that's just too much. And so we'll ask the court to vacate and remand. Thank you very much. We appreciate the argument that both of you have given. Mr. Kozak in particular, we note that you were appointed counsel under the Criminal Justice Act. And we are especially grateful for your undertaking the representation and your zealous work on behalf of Ms. Rentas. Thank you very much.